IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SARA JANE GONZALES,

       Plaintiff,

v.                                           CIV 17-0601 KBM

NANCY A. BERRYHILL,
Acting Commissioner of Social
Security Administration,

       Defendant.

# MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff's Motion to Reverse or Remand

Administrative Agency Decision (*Doc. 15*) filed on December 18, 2017. Pursuant to 28

U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as

the presiding judge and entering final judgment. *See Docs. 5, 7, 8.* Having considered

the record, submissions of counsel, and relevant law, the Court finds Plaintiff's motion is

not well-taken and will be denied.

## I.      Procedural History

On June 4, 2013, Sara Jane Gonzalez ("Plaintiff") filed an application for

disability insurance benefits ("DIB") under Title II of the Social Security Act (SSA),

alleging disability beginning September 1, 2007. Administrative Record[1] (AR) at 71-73.

Plaintiff's date last insured was September 30, 2007. AR at 72. Her claim was denied

---

[1] Document 12-1 contains the sealed Administrative Record. *See Doc. 12-1.* The Court cites the Administrative Record's internal pagination, rather than the CM/ECF document number and page.

both initially (AR at 87-89) and on reconsideration (AR at 93-95). Plaintiff requested a hearing with an Administrative Law Judge (ALJ) on the merits of her application. AR at 98-99.

In addition to Plaintiff, Leslie J. White, a vocational expert, and Steven Lovato, Plaintiff's son, also testified during the *de novo* hearing. *See* AR at 28. Plaintiff was represented by attorney Michael Armstrong. *See* AR at 28. ALJ Eric Weiss issued an unfavorable decision on March 24, 2016. AR at 14-20. Plaintiff submitted a Request for Review of Hearing Decision/Order to the Appeals Council (AR at 10), which the Council denied on March 30, 2017 (AR at 1-5). Consequently, the ALJ's decision became the final decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## II.  Applicable Law and the ALJ's Findings

A claimant seeking disability benefits must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). The Commissioner uses a sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4); *see also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

The claimant has the burden at the first four steps of the process to show: (1) she is not engaged in "substantial gainful activity"; (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and (3) her impairment(s) meet or equal one of

the listings in Appendix 1, Subpart P of 20 C.F.R. Pt. 404; or (4) pursuant to the assessment of the claimant's residual functional capacity (RFC), she is unable to perform her past relevant work. 20 C.F.R § 404.1520(a)(4)(i-iv); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (citations omitted). "RFC is a multidimensional description of the work-related abilities [a claimant] retain[s] in spite of her medical impairments." *Ryan v. Colvin*, Civ. 15-0740 KBM, 2016 WL 8230660, at *2 (D.N.M. Sept. 29, 2016) (citing 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(B); 20 C.F.R. § 404.1545(a)(1)). If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" Plaintiff retains sufficient RFC "to perform work in the national economy, given [her] age, education, and work experience." *Grogan*, 399 F.3d at 1261 (citing *Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988) (internal citation omitted)); *see also* 20 C.F.R. § 404.1520(a)(4)(v).

Here, at Step One of the process,[2] the ALJ found that Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of September 1, 2007 through her date last insured of September 30, 2007." AR at 16 (citing 20 C.F.R. § 404.1571-1576). At Step Two, the ALJ concluded that Plaintiff "had the following medically determinable impairments: depression and generalized anxiety." AR at 16 (citing 20 C.F.R. § 404.1521-1523). He also determined, however, that "[t]hrough the date last insured, [Plaintiff] did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or

---

[2] ALJ Weiss first found that Plaintiff "last met the insured status requirements of the Social Security Act on September 30, 2007." AR at 16.

combination of impairments." AR at 17 (citing 20 C.F.R. § 404.1521-1523). Having determined that Plaintiff was not under a disability at Step Two, the ALJ did not proceed to any further steps in the sequential evaluation process. AR at 18-20.

## III.    Legal Standard

The Court must "review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (internal citation omitted)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161, 1166 (10th Cir. 2012) (citation omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax*, 489 F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1172 (internal quotation omitted)). "It requires more than a scintilla, but less than a preponderance." *Id.* (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004) (internal quotation omitted) (alteration in original)). The Court will "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Id.* (quoting *Hackett*, 395 F.3d at 1172 (internal quotation marks and quotations omitted)).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200 (internal quotation omitted)). The Court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even

4

though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zoltanski*, 372 F.3d at 1200 (internal quotation omitted)).

## IV.     Discussion

Plaintiff offers three reasons for reversal of the ALJ's unfavorable disability determination. First, she contends that the ALJ erred by finding her mental impairments not severe and by concluding the sequential evaluation at Step Two. *Doc. 15* at 12-14. Second, she suggests that the ALJ breached his duty to develop the record to clarify ambiguities surrounding the extent of her mental impairments during the relevant time period. *Id.* at 14-15. Finally, she maintains that the ALJ failed to properly consider lay testimony concerning when Plaintiff manifested psychological problems and the nature of those problems. *Id.* at 23-26.

### A.     The ALJ properly found Plaintiff's mental impairments to be non-severe.

At Step Two of the sequential evaluation process, the ALJ concluded that Plaintiff had the medically determinable mental impairments of depression and generalized anxiety. AR at 16-17. Significantly, however, he determined that these impairments were ***not*** severe through her date last insured. AR at 16-17. Because a claimant must establish disability on or before her date last insured in order to receive disability benefits, *see Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010), Plaintiff must establish a disability on or before September 30, 2007. But, as the ALJ explains:

> [t]his case presents a narrow window of time during which disabling impairments would need to be proven in order to prevail. With an alleged onset date of September 1, 2007 and a date last insured of September 30, 2007, one would normally look for a run-up of medical documentation that shows severity peaking around the time of alleged onset. Here, however, records from the relevant time period are few and quite benign.

AR at 20. Indeed, the record does not reveal any visits by Plaintiff with her treating physician, Ana Rodriguez, M.D., in September 2007, though Plaintiff did see Dr. Rodriguez both before and after this time period. Given the significance of Plaintiff's 2006 and 2007 medical records to the disability determination, the Court will detail their contents.

In January of 2006, about a year and a half prior to Plaintiff's alleged onset of disability, Plaintiff presented to Dr. Rodriguez for an initial appointment. AR at 697-99. Among other issues, she reported experiencing anxiety and depression, and she recounted that she had been seen by a therapist and treated with medication two and a half years prior. AR at 697. According to Plaintiff, she had taken the prescribed medication for a "very short period of time." AR at 697. She explained that symptoms of depression and anxiety, having been untreated for two and a half years, were recurring. AR at 697. More particularly, she reported isolating herself, experiencing mood swings, and feeling lazy. AR at 697. Dr. Rodriguez diagnosed Plaintiff with moderate depression and generalized anxiety and prescribed Effexor to treat these conditions. AR at 699.

Plaintiff was seen by Dr. Rodriguez again in April of 2006, when she admitted to significant improvements, which even her husband had noticed. AR at 702. Plaintiff explained that she had more energy and had resumed cooking for her family and doing chores around the house. AR at 702. She also reported driving her children around and being less irritable. AR at 702. At the same time, Plaintiff admitted that she was experiencing significant stress, which she attributed to her attempts to clean up and sell her father's home. AR at 702. Despite this reported stress, Dr. Rodriguez described

Plaintiff as "jovial" and "energetic" and assessed her depression and anxiety as "stable." AR at 703. Dr. Rodriguez did, however, change Plaintiff's dosage of Effexor in order to address problems she reported experiencing with insomnia. AR at 702.

When Dr. Rodriguez saw Plaintiff six months later, in October of 2006, Plaintiff admitted that she was "doing much better on the higher dose of Effexor." AR at 704. She explained that "[e]veryone seem[ed] to have noticed a difference." AR at 704. Specifically, Plaintiff reported better relationships with her children, decreased irritability, improved multitasking, and the ability to take on increased responsibility. AR at 704. Plaintiff had started working three days per week, had plans to start her own housekeeping business within three months, and had agreed to serve as a secretary for her husband's home business. AR at 704. Dr. Rodriguez remarked that Plaintiff was "very animated" and did not appear depressed. AR at 705. She described Plaintiff as "a much different person today than who I met six months ago." AR at 705. Plaintiff did broach the topic of bipolar disorder at this visit, indicating that after reading an article about the disease she wondered if she might suffer from it. AR at 704. Dr. Rodriguez explained that she would refer Plaintiff to psychiatry for a formal diagnosis if she experienced any mental instability. AR at 704. Dr. Rodriguez left Plaintiff's dosage of Effexor unchanged. AR at 705.

Plaintiff did not present to Dr. Rodriguez again until fourteen months later, on December 17, 2007, three months after her date last insured. AR at 706. At that visit, she again reported doing well on Effexor. AR at 706. She admitted to suffering from premenstrual syndrome and noted that she was experiencing certain situational difficulties, including shouldering the bulk of childrearing responsibilities on account of

her husband's work schedule. AR at 706. According to Plaintiff, her husband was working overtime as well as a second job, which left her as the primary caretaker for her children and with little time to herself. AR at 706-07. Dr. Rodriguez assessed Plaintiff's depression with anxiety as "improved on Effexor," and Plaintiff was instructed to maintain her current dosage. AR at 707.

The ALJ discussed these medical records in his decision, acknowledging that upon initiating with Dr. Rodriguez in 2006, Plaintiff appeared anxious, required refocusing by Dr. Rodriguez, and was diagnosed with moderate depression and generalized anxiety. AR at 18. He also detailed Plaintiff's subsequent reports of significant improvement on Effexor during her 2006 and 2007 visits with Dr. Rodriguez. AR at 18. Particularly, he noted that upon being treated with Effexor, Plaintiff resumed cooking, doing chores, and driving her children to their appointments. AR at 18. He explained that the distress Plaintiff reported to Dr. Rodriguez in December 2007 "was of a circumstantial type." AR at 18. The ALJ emphasized that, following her December 2007 visit with Dr. Rodriguez, "the record again goes dark for another year." AR at 18.

Summarizing Plaintiff's 2006 and 2007 medical records, the ALJ concluded that the records depict a "particularly successful" application of medication. AR at 20. Indeed, he explained that Plaintiff's treatment notes remained positive through 2009 and that there was no documented decline in her mental condition until 2013, six years after her alleged onset date. AR at 20. Although the ALJ discussed later medical records from Nicole Anderson, Ph.D., Phoenix Anderson, Ph.D., and Paul Carothers, M.D., he gave their opinions no weight and described them as "essentially irrelevant," because they were removed in time from the relevant time period. AR at 19-20. He reasoned that

although Plaintiff's more recent medical records might show significant impairment, it would "defy reason to extrapolate the current severity of impairments and apply it to a time so remote in the past." AR at 20.

Plaintiff characterizes the ALJ's alleged misstep at Step Two as "legal error," maintaining that she "made the required '*de minimis* showing of impairment,'" and the ALJ should have therefore continued the sequential evaluation beyond Step Two. *Doc. 19* at 1, 3. Additionally, she submits that the ALJ's decision was not supported by substantial evidence. *See id.* at 5.

At Step Two it was the ALJ's duty to determine whether Plaintiff's alleged impairments or combination of impairments were severe during the relevant time period. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). A claimant has the burden to demonstrate that she has an impairment severe enough to interfere with her ability to work. *Bowen v. Yuckert*, 482 U.S. 137, 146-54 (1987). Although Step Two requires only a *de minimis* showing of impairment, the claimant "must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997). To meet her burden, she must "furnish medical and other evidence to support [her] claim." *See Eden v. Barnhart*, 109 F. App'x 311, 314 (10th 2004) (citation omitted). Social Security Ruling 96-3p defines the *de minimis* standard as follows: "[A]n impairment(s) is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996) (rescinded as of June 14, 2018). Step Two is "designed 'to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory

definition of disability.'" *Lee v. Barnhart*, 117 F. App'x 674, 677 (2004) (quoting *Bowen*, 482 U.S. at 156 (O'Connor, J., concurring) (subsequent citation omitted)).

Here, having determined that Plaintiff had the medically determinable impairments of depression and generalized anxiety before her date last insured, the ALJ assessed Plaintiff's limitations from mental impairments using the "paragraph B" criteria of the mental disorders listings. *See* AR 19-20; *see also* SSR 96-8p, 1996 WL 374184, at *4; 20 C.F.R. § 404.1520a (effective June 13, 2011 to January 16, 2017). In his "paragraph B" analysis, the ALJ rated Plaintiff's degree of functional limitation in the areas of "activities of daily living," "social functioning," and "concentration, persistence and pace" using a five-point scale of "none, mild, moderate, marked, and extreme." *See* AR at 19; *see also* 20 C.F.R. § 404.1520a(c)(3), (4) (effective June 13, 2011 to January 16, 2017).

The applicable regulations provide that if an ALJ rates the claimant's degree of limitation in each of these categories as "none" or "mild" and finds that the claimant has had no episodes of decompensation, he may conclude that the mental impairment is not severe, unless the evidence otherwise indicates more than a minimal limitation in the claimant's ability to do work. 20 C.F.R. § 404.1520a(c)(3) (effective June 13, 2011 to January 16, 2017). Additionally, the regulations specify that, in the "complex and highly individualized process" of rating the claimant's degree of functional limitation, the ALJ should consider all relevant evidence, including medication and other treatment. *See* § 404.1520a(c)(1) (effective June 13, 2011 to January 16, 2017).

The ALJ concluded that Plaintiff had mild or no limitations in the four broad functional areas and no episodes of decompensation of extended duration. AR at 19-20.

First, he found that Plaintiff had **no** limitation in her activities of daily living. AR at 19. He

noted that Plaintiff's son indicated in his Third-Party Function Report that she had "no

problem" with her personal care. AR at 19. He also emphasized that a psychologist who

frequently visited Plaintiff's home in 2014, at a time when Plaintiff's mental condition had

declined, still described her basic activities of daily living as "stellar" and her home as

"immaculate." AR at 19 (citing AR at 256, 477-478). He reasoned that "[b]ecause

[Plaintiff's] impairments are described as considerably more severe in present times

than in the past, it is logical to assume ADLs were at least as strong in 2007." AR at 19.

Next, the ALJ found Plaintiff to have **mild** limitations in the area of social

functioning. AR at 19. He noted that while Plaintiff reported having a limited social circle,

she was also described in medical records as a pleasant patient and indicated that she

enjoyed spending time with her mother-in-law. AR at 19 (citing AR at 672). The ALJ

referred to a report by Plaintiff's son that Plaintiff engaged in frequent interaction with

family, despite decreased social activity. AR at 19 (citing AR at 259-60). Additionally, he

referenced documentation in Plaintiff's medical records suggesting that her constricted

social circle was due in part to her "husband's preference that she not leave the home

or have friends unless he approves it." AR at 19 (citing AR at 452).

Third, the ALJ found a **mild** limitations in the area of concentration, persistence,

or pace. AR at 19. He explained that Plaintiff's son had reported that she enjoyed

reading on a daily basis, though she must sometimes re-read. AR at 19 (citing AR at

259-60). The ALJ acknowledged that, at her initial visit with Dr. Rodriguez in 2006,

before she began taking medication for her mental impairments, Plaintiff required re-

focusing and spoke in a tangential manner. AR at 19 (citing AR at 698). Finally, as to

episodes of decompensation, the ALJ found **no** record of episodes of extended duration. AR at 19.

Given these findings that Plaintiff's mental impairments caused no more than "mild" limitations in the first three functional areas and no episodes of decompensation of extended duration, the ALJ concluded that Plaintiff's mental impairments were not severe. AR at 19-20. The Court finds the ALJ's rating of Plaintiff's mental impairments to be supported by substantial evidence in the record. Thus, so long as the evidence did not otherwise indicate that there was more than a minimal limitation to Plaintiff's ability to do basic work activities, the ALJ's findings were consistent with 20 C.F.R. § 404.1520a(d)(1).

But Plaintiff insists that the evidence *did* indicate more than a minimal limitation in her ability to do basic work activities. She contends that the ALJ failed to recognize her *de minimis* showing of a severe mental impairment, because he "mischaracterized [her] response to treatment." *Doc. 19* at 2. Specifically, she refers to notations in her October 2006 record with Dr. Rodriguez, in which she admitted to being "again very irritable" and questioned whether she suffered from bipolar disorder. Read in context, however, these notations do not undermine the otherwise optimistic tone of this particular medical record. Instead, Plaintiff appears to have been referring to the historical impact of her mental impairments when she described episodes of mania and depression. She told Dr. Rodriguez that she had recently read an article about bipolar disorder and wondered if she had been suffering from it, given that she had experienced episodes of depression followed by episodes of energy. AR at 704. Apparently continuing in her explanation of the historical cycle of these symptoms, she indicated that she was "again

very irritable." AR at 704. Dr. Rodriguez responded by advising Plaintiff that she would refer her to psychiatry if she experienced "any instability" with her symptoms. AR at 704. Notably, at that very same visit, Dr. Rodriguez recorded the following:

> She admits she is doing much better on the higher dose of Effexor. She is unsure whether or not to come off visit. Everyone seems to have noticed a difference. She is getting closer with her kids, in fact, as a result of not yelling at them so much. She used to always be so irritable. This has definitely improved.

AR at 704. The Court disagrees that Plaintiff's October 2006 medical record demonstrates that the ALJ mischaracterized her response to treatment.

Plaintiff suggests that the ALJ mischaracterized her records in a second way; that is, that when Dr. Rodriguez assessed her depression with anxiety as "stable," she was actually conveying that it was in an "unchanging state, neither improving nor deteriorating." *Doc. 19* at 2-3 (quoting *Maez v. Berryhill*, 1:16-cv00766-LF, 2017 WL 6397726, at *7 (D.N.M. Dec. 14, 2017) (internal quotation omitted)). However, a review of the entirety of Dr. Rodriguez's records counsels against attributing such a meaning to the use of the word "stable." In fact, in the same records in which Dr. Rodriguez describes Plaintiff's depression with anxiety as "stable," she also describes her mental condition as "improved significantly" and even notes that she is a "much different person" who did not "appear depressed at all." *See* AR 702-05. Ultimately, Dr. Rodriguez's description of Plaintiff's mental conditions as "stable" does not constitute *de minimis* evidence of a severe mental impairment prior to her date last insured.

Next, Plaintiff contends that because the ALJ conceded that the records from the relevant time period were "almost nonexistent," it follows that the record did not "clearly establish" that Plaintiff was without severe mental impairments. Indeed, she

suggests that SSR 85-28 precludes a determination that an impairment is not severe based upon the finding of insufficient evidence. *Doc. 15* at 12-13 (citing SSR 85-28, 1985 WL 56856 (Jan. 1, 1985)). The Court agrees that a Step-Two determination of no severe impairment requires more than a finding of insufficiency of evidence. *See Chavez v. Colvin*, No. 14-cv-0453 SMV, 2015 WL 13662583, at *3 (D.N.M. May 15, 2015) (determining that the ALJ impermissibly stopped the sequential evaluation process at Step Two on the basis that there was "insufficient evidence" to find that the plaintiff had a severe impairment prior to his date last insured). Instead, SSR 85-28 requires that the evidence "clearly establish[]" that the impairment is not severe; if not, the ALJ must proceed to the subsequent steps of the sequential evaluation process. *See* SSR 85-28, 1985 WL 56856, at *3. Put another way, when an ALJ is "unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the [Step Two] not severe evaluation step. Rather, it should be continued." *Id.* at *4.

But here, the ALJ *was* able to clearly determine from the medical records the effect of Plaintiff's mental impairments on her ability to do basic work activities during the relevant time period. He simply determined that, with medication, those effects were minimal. *See* 20 C.F.R. § 404.1520a(c)(1) (effective June 13, 2011 to January 16, 2017) (providing that when rating a claimant's degree of functional limitation, the ALJ should consider all relevant evidence, including medication and other treatment). Further, the ALJ did not, as Plaintiff would suggest, premise this finding upon an insufficiency of medical records. Rather, he found that the medical records from late 2006 and 2007

depicted a "particularly successful" application of medication to Plaintiff's mental impairments, with later medical records "remain[ing] positive through at least 2009." AR at 20. In other words, the concurrent medical records demonstrated that Plaintiff was "functioning well on medication" in the time period surrounding her date last insured. AR at 17-18. Despite his acknowledgment that the "records from the relevant time period are few," the ALJ nevertheless applied the correct legal standards. He properly concluded his evaluation at Step Two after determining that the record established no more than a minimal limitation on Plaintiff's ability to do basic work activities.

Critically, the ALJ's Step Two finding is also supported by substantial evidence in the record. *See Eden*, 109 F. App'x at 314-16 (affirming finding of no severe mental impairment where substantial evidence, including examination findings and claimant's documented activities, supported the ALJ's determination). Indeed, Plaintiff's relevant medical records, though sparse, document a dramatic improvement in her mental state following the commencement of a medication regimen, so much so that in April of 2006 she resumed cooking, doing chores, and driving her children to appointments. In the year prior to her alleged onset of disability, Plaintiff was even working three days per week and had plans to start her own housekeeping business and to assist her husband in his own entrepreneurial endeavors. While there may have also been evidence outside of these records that would support a finding of a severe impairment, for instance in the testimony of Plaintiff's son, it is not the role of this Court to reweigh the evidence.

The ALJ also discussed Plaintiff's testimony that, in 2006 and 2007, she experienced panic, agoraphobia, and difficulty with memory and concentration. AR at

18. However, he found her statements concerning the intensity, persistence, and limiting effects of her symptoms not entirely credible. AR at 19. He explained that her credibility was eroded by "long gaps in treatment, a poor work history in general, and the fact that much of her stress was then described as environmental." AR at 20. Upon review of the records, the Court finds these conclusions to be supported by substantial evidence. Plaintiff's mental impairments were, in fact, left untreated in the two and a half years prior to her initiating with Dr. Rodriguez, *see* AR at 697, and, furthermore, she failed to seek treatment for 14 months in and around the relevant time period – from October 2006 to December 2007. The record also demonstrates what could fairly be characterized as a poor work history. For instance, it shows that beginning in 1982, Plaintiff reported no earnings in a number of years and never earned more than $10,000 in a given year. AR at 186. Finally, as discussed hereinafter, much of Plaintiff's stress was indeed attributed to situational causes.

In short, the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record.

### B. The ALJ did not breach his duty to develop the record.

Next, Plaintiff argues that the ALJ failed to develop the record in various ways. First, she contends that the ALJ should have developed the record by calling a medical advisor to properly determine her onset date pursuant to SSR 83-20. *Doc. 15* at 15. SSR 83-20 provides that "[i]n addition to determining that an individual is disabled, the decisionmaker must also establish the date of disability." SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983). When the onset date of disability must be inferred, the ruling clarifies that the ALJ "should call on the services of a medical advisor." *Id.* at *3. It

becomes necessary to infer the onset date when, for instance, "the alleged onset and the date last worked are far in the past and adequate medical records are not available." *Id.* at *2.

Yet, the Commissioner maintains that Plaintiff's reliance on SSR 83-20 is misplaced, because a finding of disability is a prerequisite to determining onset date. *Doc. 17* at 16. The Court agrees. As the Tenth Circuit has clarified, the use of a medical expert "is helpful where the ALJ has determined that the claimant eventually became disabled but there is some ambiguity about whether the onset of this disability occurred prior to the expiration of the claimant's insured status." *Hill v. Astrue*, 289 F. App'x 289 (10th Cir. 2008). In this case, of course, there has been no disability determination that would trigger the use of SSR 83-20 to infer an onset date. Moreover, Plaintiff's contemporaneous medical records adequately address the progression -- or in her case, the stabilization -- of her mental impairments during the time surrounding her date last insured. As discussed above, the late 2006 and 2007 medical records show that her depression and anxiety improved dramatically once she began taking medication. Where there is substantial evidence to support the ALJ's finding that the medical records establish no more than a minimal limitation on a claimant's ability to do basic work activities, as there is here, there is simply no need to call upon the services of a medical advisor to infer an onset date.

Plaintiff's next argument is curious. She suggests that rather than developing the record, the ALJ "rejected all existing medical evidence," relying on "lay speculation" rather than "concrete medical evidence" in reaching an unfavorable disability determination. *Doc. 15* at 18. Plaintiff specifically takes issue with the ALJ's finding that

her credibility was eroded because much of her stress was described as "environmental." *See id.* She insists that "[t]here is no mention in the records from 2006-2007 that Ms. Gonzales' stress was 'environmental' in nature." *Id.* The issue identified by Plaintiff appears to be one of semantics. While Dr. Rodriguez did not refer to Plaintiff's stressors using the word "environmental," she certainly identified stress-inducing circumstances apart from Plaintiff's mental impairments. Again, in April 2006, Plaintiff attributed her stress to responsibilities in cleaning up and selling her father's home. *See* AR at 702. Then, in December 2007, she reported that she was "doing well on the Effexor" but mentioned "situational issues that make things worse," including her husband's onerous work schedule, which left her to do most of the childrearing. AR at 706. Significantly, Dr. Rodriguez assessed Plaintiff's depression and anxiety as "stable," despite her admission of these circumstantial stressors and continued her dosage of Effexor indefinitely. *See* AR at 703, 705, 707. The ALJ neither rejected the relevant medical evidence nor speculated regarding environmental stressors. Rather, his findings were grounded in substantial evidence.

Next, Plaintiff takes issue with the ALJ's failure to order a retrospective consultative evaluation. *Doc. 15* at 19-21. Although the ALJ reasoned that it would be unreasonable to extend the present severity of Plaintiff's impairments back to September of 2007, Plaintiff insists that the use of either a retrospective consultative evaluation or a psychiatric expert was warranted. *Id.* She notes that "physicians may retroactively diagnose disease, which is especially important in cases involving a progressive impairment." *Id.* at 19 (citing *Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990)). She submits that a retroactive consultative

evaluation could have filled in the gaps left by inadequate medical records and helped determine whether the evidence from 2006 to 2007 could lead to a conclusion that Plaintiff's claims of disability were "credible and substantive." *Id.* at 21. Yet, "a retrospective diagnosis without evidence of actual disability is insufficient. This is especially true where the disease is progressive." *Potter*, 905 F.2d at 1349. Regardless of whether Plaintiff would be deemed disabled at some later time, her records from 2006 and 2007 do not support a finding that she was disabled before her date last insured. A retrospective expert was unnecessary where the medical records were adequate for the ALJ to reach a determination as to the degree of limitation on Plaintiff's ability to perform basic work activities.

Finally, Plaintiff also characterizes the ALJ's rejection of her more recent medical records, those from 2013 and 2014, as a violation of the duty to develop the record. She maintains that the records dated after September 30, 2017, were not only relevant but that they triggered a duty to develop the record further. *Doc. 15* at 21-23. For instance, Plaintiff notes that Dr. Carothers suggested that the onset date for her depression was eight years prior to 2014, or in 2006. *Id.* at 22 (citing AR at 675). According to Plaintiff, the ALJ could have made inferences about the progression of her depression from the more recent medical records. *Id.* Plaintiff contends that the ALJ improperly rejected these more recent opinions based solely on their timing, contrary to the Tenth Circuit's guidance in *Anderson v. Astrue*, 319 F. App'x 712 (10th Cir. 2009). *Id.* at 21-22.

In *Anderson*, the Tenth Circuit determined that the timing of a treating physician's opinions was an inadequate reason for rejecting them; this case, however, is distinguishable. Here, the ALJ relied upon the available medical records from the year

preceding and the years immediately following Plaintiff's date last insured. *See, e.g.*, AR at 18. In *Anderson*, in contrast, the ALJ "narrowly construed the evidentiary period," treating as relevant "only the few months surrounding" the date of the plaintiff's date last insured. *Anderson*, 319 F. App'x at 722. Significantly, the Tenth Circuit there reasoned that the earlier medical records might have permitted inferences about the progression of the plaintiff's impairment, which was undisputed and permanent. *Id.*

Here, the record reveals that the opinions of Drs. Anderson and Dr. Carothers addressed Plaintiff's mental functioning in 2013 and 2014, six to seven years *after* Plaintiff's date last insured. *See* AR at 452-54, 496, 675-77, 692-93. The ALJ expressly discussed these more recent opinions, *see* AR at 19-20, and ultimately concluded that "[t]hey do not address the relevant period and receive no weight." AR at 19-20. Having conducted its own review, the Court is satisfied that these records do not in fact relate Plaintiff's mental condition in 2013 and 2014 to her condition in September 2007, and they did not trigger a duty to further develop the record. *See Flaherty v. Astrue*, 515 F.3d 1067, 1069, 1072 (10th Cir. 2007) (concluding that because a later medical opinion did not relate the claimant's condition to the earlier, relevant period, no duty to develop the record arose on the basis of that opinion).

Plaintiff emphasizes that Dr. Carothers "indicated" in his 2014 medical records that Plaintiff's onset date for depression was approximately 2006. *See Doc. 15* at 14, 17 (citing AR 675). The Court disagrees that the referenced notation in Dr. Carothers' record triggered a duty to further develop the record. The "subjective" portion of that February 19, 2014 record merely suggests that Plaintiff reported that her history of present illness, or "HPI," involved "mild" depression with an onset of "about 8 years." AR

at 675. Not only is this notation not a medical source opinion, *see Seiber v. Colvin*, No. 13-2162 JWL, 2014 WL 4908957, at *9 (D. Kan. Sept. 30, 2014), it is *consistent* with Dr. Rodriguez's records from 2006 and 2007. Further, it is not inconsistent with the ALJ's finding that Plaintiff had medically determinable mental impairments of depression and generalized anxiety which were not severe through her date last insured. The record was sufficient for a determination concerning disability.

### C. The ALJ properly considered and rejected lay testimony concerning Plaintiff's mental impairments.

Plaintiff argues that the ALJ improperly rejected the lay testimony of her son, Steven Lovato. *Doc. 15* at 23-26. As she notes, evidence from family members can be used to show the severity of the individual's impairments and how it affects their ability to work. *See* 20 C.F.R. § 404.1513(d)(4) (effective from September 3, 2013 to March 26, 2017). When considering such opinions, the ALJ must consider various factors, including "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p, at *6 (rescinded March 27, 2017).

The ALJ explicitly discussed Mr. Lovato's statements in his decision. He explained that his 2014 written statements appeared to "deal with present times, well after the date last insured." AR at 18. Accordingly, he assigned them "no weight." AR at 18. In contrast, he assigned "limited weight" to Mr. Lovato's oral testimony. AR at 18. It is primarily Mr. Lovato's oral testimony, offered at the time of the *de novo* hearing, on which Plaintiff relies. *See Doc. 19* at 7. The ALJ acknowledged Mr. Lovato's testimony that, during the relevant time period, Plaintiff was depressed, did not take good care of herself, did not take her medications as prescribed, and would at times engage in

"paranoid" behaviors. AR at 18. Nevertheless, he determined that these statements were "inconsistent with the concurrent medical records, which show the claimant was functioning well on medication." AR at 18.

In the Court's view, this conclusion that Mr. Lovato's testimony is at odds with the concurrent medical records was an entirely reasonable one supported by substantial evidence. Where Mr. Lovato testified that Plaintiff was depressed and unable to take good care of herself during the relevant period, Dr. Rodriguez reported that she was doing well on Effexor, even cooking, doing chores, driving her children to appointments, and working part-time. Further, consistency with other evidence of record is one of the factors explicitly enumerated in SSR 06-3p for evaluation of lay testimony. The Court is satisfied that the ALJ offered a legitimate reason for rejecting, or offering only limited weight to, the opinions of Mr. Lovato.

## V.     Conclusion

The Court concludes that Plaintiff has failed to demonstrate that the ALJ erred in his Step-Two determination that her mental impairments were not severe.

Wherefore,

**IT IS ORDERED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision (*Doc. 24*) is **DENIED**.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent